## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| **REBECCA L. SWETAVAGE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:07-0430** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case was referred to the undersigned United States Magistrate Judge by Standing Order to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 5.) Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 9-10 and 13.)

The Plaintiff, Rebecca L. Swetavage (hereinafter referred to as "Claimant"), filed an application for DIB on May 24, 2004 (protective filing date), alleging disability as of June 1, 2002, due to significant brain damage, back pain, and mental problems. (Tr. at 33, 43, 58-60, 70, 87.) Claimant later amended her onset of disability date to March 6, 2004. (Tr. at 57.) The claim was denied initially and upon reconsideration. (Tr. at 33-35, 43-45.) On June 24, 2005, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 47.) A hearing was held on January 20, 2006, before the Honorable John T. Yeary. (Tr. at 331-71.) On March 8, 2006, the ALJ issued a decision denying Claimant's claim for benefits. (Tr. at 18-26.) The ALJ's decision became the final

decision of the Commissioner on May 25, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 4-7.) On July 11, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2006). The Commissioner must show two things: (1)

that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is

3

incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 25, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from back strain, an organic mental disorder, and depression, which were severe impairments. (Tr. at 25, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or medically equal the level of severity of any listing in Appendix 1. (Tr. at 25, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity

to perform light exertional level work; she can occasionally climb, balance, stoop, kneel, crouch and crawl; she should avoid concentrated exposure to extreme cold, vibration, and hazards; she requires work involving simple, repetitive tasks.

(Tr. at 25, Finding No. 6.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 25, Finding No. 7.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a small product assembler, bottle packager, and laundry folder, at the light exertional level. (Tr. at 24 and 25, Finding No. 12.) On this basis, benefits were denied. (Tr. at 24-25.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined

as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

Claimant's Background

Claimant was born on July 11, 1954, and was 51 years old at the time of the administrative hearing, January 20, 2006. (Tr. at 19, 24, 58, 336.) Claimant has a high school education and attended junior college for a period of six months. (Tr. at 19, 24, 76, 336.) In the past, she worked as an assignment clerk, a programming assistant, sales representative, secretary, and office clerk. (Tr. at 19, 71, 103-09, 365.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence and will discuss it in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) crediting the opinions of the non-treating and non-examining medical sources over the opinions of Claimant's many treating and examining medical sources regarding the

mental and physical limitations resulting from Claimant's head injury, depression, and anxiety; and (2) assessing Claimant's pain and credibility. (Document No. 10 at 14-17.) The Commissioner asserts that these arguments are without merit and that the ALJ's decision is supported by substantial evidence. (Document No. 13 at 10-19.)

1. Medical Source Opinions.

Claimant first argues that in assessing her residual functional capacity ("RFC"), the ALJ failed to employ the proper method for evaluating the various medical opinions. (Document No. 10 at 14.) Claimant asserts that the ALJ's analysis was legally flawed and was filled with factual error and omissions. (Id. at 15.) Specifically, Claimant contends that the ALJ erred in discounting the opinions of her treating medical sources and giving more weight to the opinions of non-examining, non-treating medical sources. Citing 20 C.F.R. § 404.1527(d)(2)(i) and case law, including Millner v. Schweiker, 725 F.2d 243, 245 (4th Cir. 1984), Claimant asserts that the opinions of non-treating, non-examining medical sources do not constitute substantial evidence such as to entitle the ALJ to give little weight to the opinions of treating sources.

Regarding her physical impairments, Claimant asserts that the ALJ relied upon the opinions of consultative examiner Dr. Lecaros-Trinidad and Dr. Schwartz, her initial treating orthopedist, for the proposition that Claimant was capable of performing light work. (Id.) Dr. Lecaros-Trinidad, however, only opined that Claimant was able to perform the lifting requirements of light work; she explicitly stated that Claimant did not possess the ability to stand, walk, or sit for at least six hours during an eight-hour workday. (Id.) Furthermore, Dr. Schwartz did not opine as to Claimant's ability to sit, stand, or walk, but reported findings of abnormal sensory deficits, back pain, and sciatica, which conditions are inconsistent with the ability to perform light work. (Id.) Claimant testified that she was able to stand for only one to two hours, and asserts that the examining and treating sources confirmed

her testimony. (Id.)

Regarding her mental impairments, Claimant alleges that the ALJ failed to state his rationale for concluding that her "cognitive and psychological impairments could be accommodated by a job which required only simple repetitive tasks." (Document No. 10 at 16.) She further alleges that the ALJ improperly determined that Dr. Syed's opinion was inconsistent with the record, and failed to mention, or assign weight to, the assessments of Sunny Bell and the Neurocognitive Assessment performed by psychologists at HealthSouth Rehabilitation Hospital. (Id.) These assessments indicated that marked impairments in Claimant's cognitive functioning were exacerbated by her psychological impairments. (Id.)

The Commissioner asserts that though Dr. Lecaros-Trinidad stated that Claimant could stand or walk for two hours, "she was most likely referring to [Claimant's] ability to perform those activities at one time." (Document No. 13 at 11.) The Commissioner reasons that there is nothing in Dr. Lecaros-Trinidad's report to suggest that Claimant was unable to "perform 'a good deal of walking or standing' throughout the work day." (Id.) Consequently, the ALJ's decision to accord Dr. Lecaros-Trinidad's opinion significant weight is supported by substantial evidence. (Id.) The Commissioner further asserts that contrary to Claimant's contention, Dr. Schwartz's diagnoses of low back pain and decreased sensation did not equate an inability to perform light work in view of his treatment notes indicating that Claimant's condition had significantly improved and that she no longer experienced low back pain or had radicular symptoms. (Id. at 12.) Therefore, Dr. Schwartz's opinion did not corroborate Claimant's claim that she had difficulty standing or walking, and the ALJ's decision to accord the opinion significant weight is supported by substantial evidence. (Id.)

Notwithstanding Dr. Lecaros-Trinidad's and Dr. Schwartz's opinions, the Commissioner contends that other medical evidence supported the ALJ's RFC assessment. (Document No. 13 at 12-

8

13.) Particularly, Dr. Shammaa, the only physician who treated Claimant for her physical complaints during the relevant time period between March, 2004, and March, 2006, never diagnosed a musculoskeletal impairment or made any adverse findings regarding Claimant's ability to sit, stand, or walk. (Id.) Additionally, Ms. Bell observed on consultative examination of Claimant that she had a normal gait and posture. (Id. at 13.) Despite Claimant's contention to the contrary, the Commissioner, citing Smith v. Schweiker, 795 F.2d 343, 345-46 (4th Cir. 1986) and 20 C.F.R. § 404.1527(f)(2)(I), asserts that the ALJ may rely on the medical opinions of state agency medical consultants "when, as in this case, their opinions are consistent with the medical findings of record and not contradicted by other credible evidence." (Document No. 13 at 13.) Accordingly, the Commissioner maintains that the ALJ's finding that Claimant could perform light work was supported by the various medical opinions, which constituted substantial evidence of record. (Id.)

Regarding Claimant's mental limitations, the Commissioner asserts that the ALJ's finding that Claimant was limited to work involving only simple, repetitive tasks properly was based on the evaluation of the various medical opinions. (Document No. 13 at 13.) Specifically, though Dr. Syed opined that Claimant's impairments affected her ability to work with others, relate to superiors, and maintain acceptable attendance, Dr. Syed's opinion was not presented to the ALJ. (Id. at 14.) Rather, Claimant submitted Dr. Syed's assessment, dated August 3, 2006, to the Appeals Council, after the ALJ rendered his decision on March 8, 2006. (Id.) To the extent that Claimant alleges that Dr. Syed's August, 2006, opinion warrants a remand, the Commissioner asserts that it does not because it does not relate to the period on or before the ALJ's decision, would not change the outcome in this matter, and therefore, is not material. (Id. at 14-15.) Remand, therefore, is not warranted. (Id. at 15.) The ALJ considered and properly rejected Dr. Syed's May, 2005, opinion because it was inconsistent with his progress notes, which indicated that Claimant was doing fairly well on medication, was able to care

for her activities of daily living, and was able to go out. (Id. at 14.) Furthermore, psychological testing revealed that Claimant's cognitive functioning was within the normal range, and therefore, Dr. Syed did not diagnose a cognitive impairment. (Id.) Consequently, there was a substantial basis for the ALJ to reject Dr. Syed's disability opinion. (Id.)

Contrary to Claimant's contention, the Commissioner asserts that the ALJ specifically referenced evidence from both Ms. Bell's consultative report and the neurocognitive assessment from HealthSouth. (Document No. 13 at 15.) The neurocognitive assessment revealed severe cognitive limitations, but was rendered before Claimant began treatment. (Id.) Treatment records demonstrate that Claimant's cognitive functioning had significantly improved upon discharge in September, 2003. (Id.) Dr. Harrison confirmed this improvement in December, 2003. (Id. at 16.) Regarding Ms. Bell, the Commissioner asserts that her findings support the ALJ's decision. (Id.) Ms. Bell opined that Claimant's concentration, persistence, and pace all were within normal limits and that she had average intellectual functioning. (Id.) She noted that Claimant engaged in activities of daily living and social functioning. (Id.) Though Ms. Bell opined that Claimant's memory was moderately to severely impaired, the Commissioner asserts that the ALJ's limiting Claimant to simple repetitive tasks accounted for Ms. Bell's limitation. (Id.) Accordingly, the ALJ properly mentioned and considered the assessments from HealthSouth and from Ms. Bell. (Id.)

Additionally, the Commissioner asserts that the ALJ's mental RFC finding is supported by the state agency psychological consultants who opined that Claimant was capable of learning and performing simple, unskilled work-like activities. (Id.) In view of the foregoing, the Commissioner therefore asserts that the ALJ properly evaluated the various medical opinions and that the weight accorded them was based on substantial evidence. (Id.)

<u>Analysis</u>.

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id.</u> "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006).

In determining what a claimant can do despite his limitations, the SSA must consider

11

the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2004). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)."

12

Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2004). The ALJ, however, is not bound by any findings made by state agency

13

medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

A. *Physical Limitations*.

The ALJ reviewed and summarized the medical evidence of record in his decision. (Tr. at 21-23.) The ALJ noted that on May 25, 2002, Claimant suffered a closed head injury and a brief loss of consciousness resulting from her fall from a mule-drawn wagon. (Tr. at 21.) On June 2, 2002, a head CT scan revealed a subarachnoid hemorrhage and signs of cerebral edema in the left hemisphere with

mild right midline shift. (Tr. at 21, 148.) Cervical spine x-rays of the same date revealed cervical straightening and mild narrowing at the C5-6 disc space. (Tr. at 21, 150.) On July 18, 2002, Claimant underwent a neurologic consultation by Dr. Thomas H. Harrison, M.D., for residuals of her head injury. (Tr. at 21, 226-27.) Claimant complained of frequent headaches, excessive drowsiness, sleeping more than she should, and a slowing of her cognitive functioning, including difficulty concentrating, thinking, remembering, and spelling. (Tr. at 21, 126.) She further complained of neck and back pain, as well as anxiety. (Id.) On exam, Dr. Harrison observed that Claimant was alert and oriented, was able to remember things that happened the day before, exhibited no focal weakness, and had intact sensation. (Tr. at 21, 127.) Dr. Harrison prescribed Vicodin ES for Claimant's headaches and opined that "[s]he remains totally disabled from working at the present time." (Id.) An EEG showed only mild disorganization and slowing in Claimant's left temporal lobe. (Tr. at 21, 225.) Dr. Harrison noted on August 12, 2002, that Claimant had improved from a cognitive standpoint, but continued to experience a lot of headaches. (Id.) In view of her improvement, Dr. Harrison released Claimant to return to work on a part-time basis for one week, and then on a full-time basis as tolerated. (Id.)

Dr. Harrison next examined Claimant on January 13, 2003, by which time she had begun to experience cognitive and psychological dysfunction with difficulty maintaining her train of thought, multitasking, persisting in her tasks, as well as symptoms of irritability, frustration, and crying. (Tr. at 21, 223.) On April 29, 2003, Dr. Harrison noted that Claimant was not nearly as depressed and anxious as before, but continued to have significant difficulty with cognitive functioning. (Tr. at 21, 222.) He referred Claimant to Mr. Steve Fox, M.A., CRC, a neuropsychologist at the Brain Injury Evaluation Center at HealthSouth. (Tr. at 21, 220-21.) Mr. Fox completed a Neurocognitive Assessment in which he opined that Claimant's ability to learn and recall visual information was markedly impaired. (Tr. at 21, 160.) He further opined that her ability to attend to, concentrate on,

15

process, and integrate verbal information was haphazard and inconsistent, and that her ability to learn and recall verbal information was impaired. (Id.) WAIS-III testing revealed a verbal IQ of 85, a performance IQ of 85, and a full scale IQ of 85. (Tr. at 21, 159.) Results of the Rey-Osterreith Drawing Trails A and B and the Block Design Subscale indicated that her ability to learn and recall visual information was markedly impaired. (Tr. at 21, 160.) Mr. Fox recommended that she undergo rehabilitation to develop specific cognitive strategies to improve attention, concentration, organization, and memory. (Tr. at 21, 161.) Particularly, he recommended that she receive speech therapy, occupational therapy, and counseling to assist with emotional adjustment issues and provide brain injury education. (Id.) Claimant received these therapies and counseling at HealthSouth through September 24, 2003. (Tr. at 21, 151-217, 218.)

In a general letter regarding Claimant's condition, dated July 7, 2003, Dr. Harrison opined that Claimant "has made a fair recovery from [her] injury but has been left with some cognitive impairment." (Tr. at 221.) Following her therapy at HealthSouth, Dr. Harrison examined Claimant on December 24, 2003, and noted that Claimant had done quite well since April 29, 2003. (Tr. at 21, 218.) Claimant reported that the therapy and counseling definitely helped her and that she continued to work. (Id.) She reported continued difficulty with some cognitive functioning and memory, as well as some absent-mindedness, but noted that she was able to do her work. (Id.) Claimant also reported that she had not been depressed. (Id.) Dr. Harrison observed that Claimant had "gradually improved over the past year and one-half and that "[h]er general health is good." (Id.) He diagnosed mild residual cognitive impairment secondary to her status post closed head injury with subarachnoid hemorrhage, without evidence of any progressive brain disease. (Id.)

Claimant also sought treatment from Craig A. Schwartz, M.D., from September 23, 2002, through December 5, 2002, for complaints of low back pain, lower extremity pain, and tingling

16

sensations in her toes. (Tr. at 254-63.) On September 23, 2002, Claimant exhibited mild pain to palpation in the midline at L5-S1 of the lumbar spine. (Tr. at 262.) The exam of her cervical spine was normal, she exhibited a steady gait, and was able to arise from a standing position independently. (Id.) Dr. Schwartz further noted that her coordination, heel to shin and finger to nose tests were intact bilaterally. (Id.) He diagnosed low back pain and right lower extremity sciatica and tingling in the right toe, which may have been secondary to lumbar root irritation. (Tr. at 261.) A lumbar MRI scan however, showed only a congenitally small spinal canal and mild disc dessication at L5-S1. (Tr. at 235, 260.) Claimant reported that her low back pain was better and that she had rare episodes of right lower extremity pain when lying on her right side. (Tr. at 260.) Physical exam demonstrated only mild pain to palpation in the right lumbar region and decreased sensation over the third, fourth, and fifth toes of the right foot. (Id.) On October 31, 2002, after having three physical therapy sessions, Claimant reported less back and right lower extremity pain, though she noted that the tingling in her toes remained unchanged. (Tr. at 259.) On exam, she exhibited normal lumbar range of motion, had no lumbar pain to palpation, and normal sensation except over her right third and fourth toes. (Id.) Dr. Schwartz continued his diagnoses of back pain and right lower extremity discomfort, but noted an improvement in symptoms. (Id.)

After continued therapy, Dr. Schwartz noted on December 5, 2002, that Claimant had done much better, with no reports of low back pain or right lower extremity radicular symptoms. (Tr. at 258.) He noted normal ranges of lumbar motion, sensation, and strength. (Id.) He noted that Claimant's history of back pain and right lower extremity discomfort was "significantly improved" and recommended that she finish her physical therapy program to be followed with home exercises. (Id.) Nearly two years after he last examined Claimant, Dr. Schwartz completed a Routine Abstract Form Physical on September 6, 2004. (Tr. at 254-57.) He opined that Claimant should not lift anything in

excess of twenty pounds. (Tr. at 257.)

On September 30, 2004, state agency medical consultant Rogelio T. Lim, M.D., completed a physical RFC Assessment on which he opined that Claimant was limited to performing light work with occasional postural and certain environmental limitations. (Tr. at 277-86.) He acknowledged Claimant's history of low back pain but noted that there was no spinal stenosis or disc herniation, only evidence of a congenitally small spinal canal. (Tr. at 282.) He further noted Claimant's obesity, but acknowledged that she was ambulatory, had no focal neurological deficit, was able to walk on her heels, and could squat without difficulty. (Id.) Consequently, he opined that Claimant's allegations were partially credible. (Id.)

On September 2, 2004, Claimant underwent a consultative examination by Dr. Cristina Lecaros-Trinidad, M.D. (Tr. at 246-53.) Dr. Lecaros-Trinidad noted Claimant's reports of low back pain and numbness in her fourth and fifth toes, and her inability to lie on her left side due to leg aches. (Tr. at 247.) On exam, however, Dr. Lecaros-Trinidad observed no edema of the extremities; normal sensation, strength, grip, and straight leg raises in the sitting and supine position; that Claimant ambulated without assistive devices; that she walked on her heels and toes without difficulty; that she could squat and get on and off the exam table without much difficulty; and that her gait and station were normal. (Tr. at 249.) Dr. Lecaros-Trinidad diagnosed low back pain from degenerative joint disease and noted that she had reached maximum medical improvement regarding her head injury. (Id.) Regarding Claimant's functional capacity, Dr. Lecaros-Trinidad opined:

> The claimant can tolerate sitting for about an hour and stand/walk for two hours. She can lift/carry about 10 pounds frequently and 20 pounds occasionally. Her fine manipulative ability is intact. She can drive, but not too often as she has short attention span. These findings are based on the history and physical examination performed today."

(Tr. at 249.)

The ALJ reviewed and summarized the medical evidence of record, including Claimant's treatment with Drs. Harrison and Schwartz. (Tr. at 21-23.)  The ALJ considered Dr. Schwartz's opinion, noting that he was the treating orthopedist when she lived in Florida, and accorded significant weight to the opinion. (Tr. at 22-23.) As discussed above, Dr. Schwartz only opined that Claimant was capable of performing lifting requirements that was consistent with light exertional level work. As Claimant and the Commissioner point out, Dr. Schwartz did not offer an opinion regarding Claimant's ability to sit, stand, or walk. To the extent that Claimant asserts Dr. Schwartz's diagnoses of back pain and sciatica in the right lower extremity equate an inability to perform light level work, she is mistaken. Dr. Schwartz initially observed only mild pain to palpation of Claimant's lumbar spine, together with Claimant's subjective complaints of low back pain and right lower extremity discomfort. Claimant was treated with physical therapy and as of Dr. Schwartz's last examination of her, he noted that her conditions had "significantly improved," noting only a history of back and right lower extremity pain. Thus, the diagnoses alone do not support Claimant's assertion that she was unable to perform the exertional demands of light work. Dr. Schwartz's opinion regarding Claimant's ability to lift is supported by his treatment notes, and the other evidence of record.

The ALJ also acknowledged the consultative exam and opinions of Dr. Lecaros-Trinidad. (Tr. at 22-23.) As discussed above, Dr. Lecaros-Trinidad opined that Claimant was capable of standing or walking for two hours and lifting or carrying ten pounds frequently and twenty pounds occasionally. The ALJ accorded Dr. Lecaros-Trinidad's opinion significant weight. (Tr. at 23.) Claimant asserts that Dr. Lecaros-Trinidad's opinion regarding her ability to stand or walk is inconsistent with light exertional level work. The undersigned agrees with the Commissioner, however, and finds that Dr. Lecaros-Trinidad's report of her consultative examination does not suggest an inability to perform a good deal of walking or standing throughout the workday. Her examination of Claimant essentially

19

was normal, with the exception of some limited range of motion. Claimant exhibited normal sensation, strength, straight leg raises, gait, and station. She was able to walk on her heels and toes without difficulty, could squat, and could get on and off the exam table without difficulty. Based on her consultative exam, it was reasonable for the ALJ to conclude that Dr. Lecaros-Trinidad's standing and walking limitation was intended to reference an ability to do so at one time.

The opinions of Drs. Schwartz and Lecaros-Trinidad also are supported by the opinion of the state agency medical consultant, Dr. Lim, and the treatment notes of Dr. Shammaa and Sunny Bell. Dr. Shammaa treated Claimant from April 12, 2004, through April 25, 2005. (Tr. at 271-76.) Dr. Shammaa's treatment notes do not evidence any musculoskeletal impairment, and include diagnoses of sinusitis, allergic rhinitis, hypertension, and obesity. (Tr. at 271.) His notes contain an x-ray of Claimant's left knee, which revealed only slight narrowing of the medial joint compartment. (Tr. at 274.) There is no evidence of any musculoskeletal complaints or limitations. Furthermore, Sunny Bell observed on neuropsychological exam of September 13, 2004, that Claimant had normal posture and gait. (Tr. at 264.) Though the ALJ did not reference specifically the opinion of Dr. Lim, which was affirmed by Dr. Lambrechts, the undersigned finds any such error resulting therefrom to be harmless. Dr. Lim's assessment is consistent with the light exertional level opinions offered by Drs. Schwartz and Lecaros-Trinidad, is consistent with the ALJ's RFC assessment, and is supported by the substantial evidence of record. See 20 C.F.R. §§ 404.1527(f)(2); 417.927(f)(2) (2006); Smith v. Schweiker, 795 F.2d 343, 356 (4th Cir. 1986) (stating that "the testimony of a non-examining physician can be relied upon when it is consistent with the record" and that "if the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand.").

Based on the foregoing, the undersigned finds that the ALJ properly assessed the opinions of

20

Drs. Schwartz and Lecaros-Trinidad regarding Claimant's physical impairments, and that his decision to accord them significant weight is supported by substantial evidence.

    B. *Mental Limitations*.

    Regarding Claimant's mental impairments, Claimant argues that the ALJ offered no explanation for his decision that her cognitive and psychological impairments could be accommodated by a job requiring only simple, repetitive tasks; erred in rejecting the opinion of Claimant's treating psychiatrist/neurologist, Dr. Syed; and failed to mention the opinion of Sunny Bell and the Neurocognitive Assessment performed by psychologists at HealthSouth. (Document No. 10 at 16.)

    A. *Dr. Syed*.

    The ALJ reviewed and summarized the medical evidence of record in his decision regarding Claimant's mental impairments and limitations. (Tr. at 21-23.) The evidence reveals that Claimant sought treatment from Dr. Saifiullah Syed at Appalachian Psychiatric Services from February 18, 2005, through May 31, 2005, for treatment of her mood and anxiety problems. (Tr. at 307-12.) In February, 2005, Claimant reported problems with her memory, depression, crying spells, and decreased energy. (Tr. at 310.) On exam, Dr. Syed noted that she had a broad affect, euthymic mood, good eye contact, coherent thought process and content, and fairly intact memory, insight, and judgment. (Tr. at 311.) He acknowledged Claimant's subjective reports of problems with recent memory and cognition. (Id.) He diagnosed dysthymic disorder, late onset; anxiety DO NOS; and a GAF of 55.[2] Dr. Syed treated Claimant with Paxil and Wellbutrin. (Id.) On April 15, 2005, Claimant

---

    [2] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

reported that she was doing fairly well, but had problems with her sleep. (Tr. at 309.) Dr. Syed opined that her depression was moderate and her anxiety was mild. (Id.) On exam, Claimant exhibited a dysthymic mood, broad affect, and good eye contact. (Id.) She continued to report cognitive problems. (Id.) Dr. Syed continued his diagnoses and treatment and added Remeron to help Claimant sleep. (Id.)

On May 31, 2005, Dr. Syed submitted a narrative report to Claimant's attorney regarding the status of Claimant's mental condition. (Tr. at 307-08.) He reported that Claimant still had depression but that the severity had decreased and that she was doing fairly well on the prescribed medications. (Id.) He also noted that she had some mild anxiety and received a score of 28 on the MMSE, which was normal regarding her cognitive functioning and memory. (Tr. at 307.) Dr. Syed reported that he examined Claimant once every two or three months. (Tr. at 308.) Dr. Syed opined that Claimant was capable of taking care of her activities of daily living and was able to go out. (Id.) He further opined that Claimant "may not be able to do full-time competitive work as she used to before. However, she could be considered in future regarding vocational rehab . . . if she was willing to go back to work." (Id.) He further opined that Claimant's depression was better since moving to West Virginia. (Id.)

The ALJ accorded less weight to Dr. Syed's May 31, 2005, opinion because his opinion was "inconsistent with his own findings." (Tr. at 23.) As discussed above, Dr. Syed had reported that Claimant was doing fairly well on her medications, was able to take care of her activities of daily living, and was able to go out. Dr. Syed also opined that her depression and anxiety were only mild and moderate, and that she received scores within the normal range on cognitive functioning testing. As the Commissioner notes, Dr. Syed did not diagnose Claimant with a cognitive impairment, only with depression and anxiety. Accordingly, the undersigned finds that the ALJ's decision to accord Dr. Syed's opinion little weight is supported by substantial evidence. Though Claimant asserts that the ALJ did not explain his reasons for discrediting Dr. Syed's opinion, he specifically stated that it was

22

inconsistent with his progress notes, which the ALJ reviewed and summarized. Claimant's argument on this issue therefore, is without merit.

    B. _New Evidence_.

    Claimant also appears to assert that the ALJ erred in not considering Dr. Syed's opinions contained in a questionnaire dated August 3, 2006. These opinions, however, were submitted after the ALJ's March 8, 2006, decision, and do not constitute new evidence requiring remand. Following the ALJ's decision, Claimant submitted to the Appeals Council additional treatment notes from Dr. Syed dated January 31, 2006, and June 15, 2006, as well as a Psychiatric/Psychological Impairment Questionnaire completed on August 3, 2006, and a psychological testing report dated July 20, 2006, from Patsy J. Wilkerson, M.A. (Tr. at 316-18, 319-30.) The only evidence dated prior to the ALJ's decision was the January 31, 2006, treatment note, which indicated that Claimant was doing fairly well on her present prescribed medications. (Tr. at 317.) Dr. Syed noted that Claimant reported no major problems. (Id.) The treatment note dated June 15, 2006, likewise reflects that Claimant was doing fairly well on her medication and that her mood had been good. (Tr. at 318.) Claimant reported that her husband was making her go out and that she was able to drive because there was not much traffic in West Virginia as compared to Florida. (Id.)

    On the questionnaire dated August 3, 2006, Dr. Syed opined that Claimant had a GAF of 60, which was indicative of moderate symptoms. (Tr. at 320.) He assessed certain mild and moderate limitations and opined that her impairments were ongoing and expected to last at least twelve months. (Tr. at 323-26.) Dr. Syed opined that Claimant did not have a low IQ or reduced intellectual functioning, and was capable of tolerating low stress work. (Tr. at 327.) However, he further opined that it was likely she would be absent from work three or more days a month. (Id.) Nevertheless, when asked "what is the earliest date that the description of symptoms and limitations in this questionnaire

applies," Dr. Syed reported "at present."

On July 20, 2006, Patsy Wilkerson performed intellectual functioning testing and opined that Claimant's intellectual functioning scores were in the borderline to low average range, though such scores could have been an underestimate of her intellectual potential due to the effects of impaired concentration and attention. (Tr. at 330.) Though IQ scores in 2005 were in the average range, with no indication of impairments in concentration and attention, Ms. Wilkerson opined that cognitive functioning "now revealed mild impairments in attention, memory, language, calculations, and reasoning," which suggested concern regarding an acquired impairment in cognitive functioning. (Id.)

To justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).[3] In Borders, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is

---

[3] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in *Borders* provides the proper test in this circuit for remand of cases involving new evidence. This Court will apply the standard set forth in *Borders* in accordance with the reasoning previously expressed in this district:

> The court in *Wilkins v. Secretary of Dep't of Health & Human Servs.*, 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent *Borders* four-part inquiry is superseded by the standard in 42 U.S.C. 405(g). The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." However, *Borders* has not been expressly overruled. Further, the Supreme Court of the United States has not suggested that *Borders'* construction of §  405(g) is incorrect. Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent *Borders* inquiry.

*Brock v. Secretary, Health and Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W.Va. 1992) (citations omitted).

24

material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence. Id.

First, with the exception of the January 31, 2006, progress note, the evidence submitted to the Appeals Council did not relate to the period at issue considered by the ALJ. Dr. Syed specifically stated that the earliest date to which his opinions and limitations applied were at "the present," which was August 3, 2006, after the ALJ's decision. The undersigned therefore finds that the evidence appears to be not relevant. Second, the evidence does not appear to be material because it appears to have referenced Claimant's cognitive functioning after the date of the ALJ's decision. Dr. Syed's progress notes support his previous opinions that Claimant's conditions had improved.

Third, as stated above, with the exception of one progress note, the medical records and reports were dated after the date of the ALJ's decision. Therefore, with the exception of the January 31, 2006, progress note, Claimant has shown good cause for the failure to submit this evidence when the claim was before the Commissioner. Finally, the evidence submitted to the Appeals Council was provided to the Court, and therefore, Claimant satisfies the fourth requirement of Borders. However, the Claimant has failed to satisfy all four factors of Borders, particularly the first and second factors, and, therefore, remand would be inappropriate. The Court finds that the Commissioner's decision is supported by substantial evidence.

*C. Sunny Bell*.

On September 13, 2004, Sunny Bell completed a neuropsychological profile of Claimant. (Tr. at 264-70.) Claimant reported depression, crying episodes, decreased energy, sleep difficulty, irritability, decreased libido, feelings of hopelessness and helplessness, and being withdrawn. (Tr. at

25

264.) She denied suicidal or homicidal ideation or plan. (Id.) On mental status exam, Ms. Bell observed that Claimant was cooperative, motivated, interacted in a socially appropriate manner, spontaneously generated conversation, exhibited a sense of humor, had good eye contact, appeared comfortable, and displayed clear, goal-directed, and relevant speech. (Tr. at 266.) She noted that Claimant's mood was depressed, that she was tearful during the interview, and that she had a blunted affect. (Id.) She further noted that Claimant's judgment, concentration, and immediate and remote memory were normal and that her recent memory skills were markedly deficient. (Id.) WAIS-III testing revealed a verbal IQ of 91, a performance IQ of 92, and a full scale IQ of 92, which Ms. Bell estimated were accurate estimates of her current functioning. (Tr. at 267.) Ms. Bell diagnosed cognitive disorder NOS and depressive disorder NOS. (Tr. at 268.) She assessed her activities of daily living, social functioning, concentration, persistence, and pace, and found them to be adequate and normal. (Tr. at 268-69.)

On October 15, 2004, Rosemary L. Smith, Psy.D., completed a mental RFC Assessment and a Psychiatric Review Technique Form, and her opinions were affirmed by Debra L. Lilly, Ph.D., on April 28, 2005. (Tr. at 287-302, 303-06.) Dr. Smith opined that Claimant was mildly limited in her activities of daily living and in maintaining social functioning, concentration, persistence, or pace, with no episodes of decompensation. (Tr. at 297.) She considered Claimant's allegations to be partially credible. (Tr. at 299.) Dr. Smith further found that Claimant was moderately limited in her ability to understand, remember, and carry out detailed instructions. (Tr. at 303.) Nevertheless, Dr. Smith opined that Claimant retained "the ability to learn and perform simple, unskilled work-like activities." (Tr. at 305.)

Claimant asserts that the ALJ erred in failing to consider the opinions of Ms. Bell and the Neurocognitive Assessment from HealthSouth. (Document No. 10 at 16.) Contrary to Claimant's assertion, the ALJ specifically noted Ms. Bell's consultative psychological profile on September 13,

2004. (Tr. at 22.) The ALJ acknowledged Ms. Bell's assessment of markedly deficient recent memory skills. (Id.) As the Commissioner asserts, Ms. Bell's findings support the ALJ's decision. As stated above, Ms. Bell opined that Claimant's ability to maintain activities of daily living, social functioning, concentration, persistence, and pace were normal. The only marked limitation was that of recent memory and the ALJ accommodated such limitation by limiting Claimant to performing simple, repetitive tasks. Accordingly, though the ALJ may have erred in not assigning a specific weight to Ms. Bell's opinions, her opinions are consistent with the ALJ's decision and supported by substantial evidence. Consequently, the undersigned finds the ALJ's error to be harmless.

Similarly, contrary to Claimant's allegations, the ALJ acknowledged the Neurocognitive Assessment from psychologists at HealthSouth, but failed to assign any specific weight to the assessment. (Tr. at 21-22.) The ALJ however, noted that the assessment was prior to her therapy and counseling at HealthSouth and that according to the HealthSouth progress notes and Dr. Harrison, her conditions significantly improved thereafter. On December 24, 2003, Dr. Harrison even characterized her residual cognitive impairment as being only mild. The undersigned thus finds that while the ALJ may have erred in not assigning weight to the HealthSouth opinions, such error is harmless, as their opinions are reflected in the ALJ's decision and supported by the evidence of record. Accordingly, in view of the foregoing, the undersigned finds that the ALJ properly analyzed all the opinion evidence of record and that his decision is supported by substantial evidence.

2. Pain & Credibility Assessment.

Finally, Claimant alleges that the ALJ failed properly to analyze Claimant's credibility and that his "simple conclusion that [Claimant's] subjective complaints are inconsistent with the medical evidence of record does not constitute a legally proper credibility analysis." (Document No. 10 at 17.) Claimant contends that the ALJ did not cite any conflict between Claimant's testimony and the

evidence of record.  (Id.) The Commissioner asserts that the ALJ's "decision shows that he appropriately considered [Claimant's] allegations in context of all the evidence before him, including the objective medical findings, the success of her treatment, and statements by her treating and non-treating medical sources." (Document No. 13 at 17.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged.  20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.  Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.  . . .  Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms.

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the ALJ

29

must accompany his decision with sufficient explanation to allow a reviewing Court to determine whether the Commissioner's decision is supported by substantial evidence.  "[T]he [Commissioner] is required by both the Social Security Act, 42 U.S.C. § 405(b), and the Administrative Procedure Act, 5 U.S.C. § 557(c), to include in the text of [his] decision a statement of the reasons for that decision." Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986).  The ALJ's "decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge . . . ."  Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

In the instant case, the ALJ noted the requirements of the applicable law and Regulations regarding the assessment of pain and credibility. (Tr. at 20-24.) The ALJ found, at the first step of the analysis, that "the medical evidence establishes the presence of underlying physical and mental impairments capable of causing some degree of pain and the mental symptoms alleged." (Tr. at 21.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 21-24.) At the second step of the analysis, the ALJ concluded that "[C]laimant's subjective complaints and testimony are only partially credible due to the inconsistency of her complaints with the clinical findings and other substantial evidence of record." (Tr. at 21.)

The ALJ summarized Claimant's testimony in his decision, noting that Claimant stated that she had memory loss, cognitive problems, and an inability to concentrate, as well as back pain, anxiety, mood swings, and sleeping problems. (Tr. at 20-21, 345-53.) The ALJ thus noted the nature and location of Claimant's pain, and further noted the testimony that she can sit only for thirty minutes at a time, stand for one or two hours, and walk half a mile. (Tr. at 21, 354.) He further noted the side effects of Claimant's prescribed medications to include dizziness and nausea. (Tr. at 21, 358.) The ALJ also summarized Claimant's testimony regarding her activities of daily living. (Tr. at 19-20, 21, 347-

50.)

The ALJ then considered Claimant's allegations in context with the medical evidence and weighed each of her symptoms individually. For example, the ALJ considered the medical evidence regarding her physical impairments and determined that her complaints of physical pain did not preclude the performance of light exertional level activity. The ALJ further considered Claimant's allegations regarding the extent and limitations of her mental impairments in context of the medical evidence and determined that her mental impairments did not preclude the performance of simple, repetitive tasks. Claimant's allegations also were addressed, as discussed above, in connection with the opinion evidence. The ALJ's credibility analysis comprised approximately four pages of his decision, and reasonably weighed all the evidence of record. Accordingly, the undersigned finds that the ALJ's credibility assessment is supported by substantial evidence.

## PROPOSAL AND RECOMMENDATION

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings (Document No. 9.), **GRANT** the Commissioner's Motion for Judgment on the Pleadings (Document No. 13.), **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions

of the Proposed Findings and Recommendation to which objection is made, and the basis of such

objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review

by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v.

Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475,

88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v.

Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352

(1984).  Copies of such objections shall be served on opposing parties, District Judge Johnston, and

this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy

of the same to counsel of record.

DATE: August 27, 2008.

R. Clarke VanDervort
United States Magistrate Judge